GLENTEL, INC., Plaintiff,

v.

**WIRELESS VENTURES, LLC, doing business as Amerizon Wireless, Marty Cayton, Dean Cayton, Tony Cayton, Thomas H. Murphy and Kevin Stock, Defendants.**

No. 1:04–CV–190.

United States District Court,
N.D. Indiana,
Fort Wayne, Division.

March 17, 2005.

994

Leonard E. Eilbacher, Eilbacher Fletcher LLP, Fort Wayne, IN, for Plaintiff.

Thomas Andrew Herr, Barrett & McNagny LLP, Fort Wayne, IN, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

In this diversity action,[1] Plaintiff Glentel, Inc., alleges that Defendant Wireless Ventures, LLC, is liable as a successor to CTA, LLC, for a $242,266.92 judgment which Glentel obtained against CTA on April 16, 2004. (Compl.¶¶ 12, 22.) Glentel further alleges that the sale of CTA's assets was fraudulent and for the purpose of avoiding its liabilities, including its debt to Glentel (*id.* ¶ 23),[2] and that individual Defendants Marty Cayton, Dean Cayton, Tony Cayton, Thomas Murphy and Kevin Stock, the owners of the parent companies of CTA, breached a fiduciary duty owed to Glentel as a creditor of CTA (First Am.

---

1. *See* 28 U.S.C. § 1332(c). Glentel is a citizen of British Columbia, Canada (Compl.¶ 1), Wireless is a citizen of Indiana (*id.* ¶ 2), the individual Defendants are all Indiana citizens (Defs.' Am. Decl. of Citizenship ¶ 2), and the amount in controversy is more than $75,000 (Compl. ¶¶ 12, 22; First Am. Compl. ¶ 36). Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. Glentel's initial Complaint also alleged that CTA sold its assets without receiving a reasonably equivalent value for the assets. Glentel stated in its Response to Defendants' Motion for Summary Judgment that it will likely not pursue this theory. Glentel, therefore, is

Compl. ¶¶ 30–36). Before the Court is Defendants' motion for partial summary judgment,[3] which argues that (1) Wireless is not a continuation or successor to CTA and, as a purchaser of CTA's assets, is not liable for the debts of CTA; (2) Wireless was not formed for a fraudulent purpose or for avoiding debt; and (3) the individual Defendants did not owe, nor breach, a fiduciary duty to Glentel. After considering the motion and the relevant law, the Court finds that Defendants' motion for partial summary judgment should be GRANTED.

## II. FACTS[4]

CTA was in the business of selling and licensing dispatch radios, satellite phones, pagers and other wireless communications devices in Fort Wayne, Indiana, as well as other locations. (Aff. of Marty Cayton ("Marty Aff.") ¶ 1; Decl. of Leonard E. Eilbacher Ex. 1.) CTA conducted business under several assumed names registered with the Indiana Secretary of State, two of which were "Amerizon Wireless Group" and "Amerizon Wireless." (Eilbacher Decl. Ex. 1.) Glentel filed a complaint in this Court on October 17, 2003, to collect an unsecured debt owed by CTA to Glentel, and a $242,266.92 judgment was entered against CTA on April 16, 2004. *See Glentel, Inc. v. CTA, LLC,* No. 1:03–CV–0394 (N.D.Ind. April 16, 2004).

Prior to December 12, 2003, CTA was equally owned by two "s" corporations,

The Cross Development Group, Inc., and Tiger Tail Ventures, Inc. (Marty Aff. ¶ 2.) Prior to December 12, 2003, the sole shareholders of The Cross Development Group, Inc., were Marty, Dean, and Tony Cayton (*id.* ¶ 3), and the sole shareholders of Tiger Tail Ventures, Inc., were Kevin Stock and Thomas Murphy (*id.* ¶ 4). Marty Cayton was the President of CTA. (Dep. of Marty Cayton ("Marty Dep.") at 11.)

Guy Cayton, the father of Marty, Dean, and Tony Cayton (Eilbacher Decl. ¶ 6), was an employee of CTA from January 1, 2001, to December 12, 2003 (Aff. of Guy Cayton ("Guy Aff.") ¶ 5). Guy Cayton was never an owner of CTA, The Cross Development Group, Inc., or Tiger Tail Ventures, Inc., nor was he involved in the management of CTA. (*Id.*) He had previous experience in the wireless communications industry and had owned a telecommunications company in North Carolina (*id.* ¶ 6), but was semi-retired until his involvement with Wireless (Marty Dep. at 24).

On or about September 30, 2002, CTA and National City Bank of Indiana entered into a note whereby National City agreed to loan CTA $2,600,000. (Marty Aff. ¶ 5.) Pursuant to this transaction, National City obtained a security interest in all of CTA's assets.[5] (Marty Dep. at 20.)

CTA later encountered financial difficulties, and National City instructed it to find

deemed by this Court to have abandoned such claim, as it has failed to support it with sufficient evidence.

3. A counterclaim filed by Wireless and the individual Cayton Defendants alleging tortious interference with contractual relationships, unlawful restraint of trade, bad faith, breach of contract, and defamation is not part of this motion for summary judgment. (Docket # 29.)

4. For summary judgment purposes, the facts are recited in the light most favorable to

Glentel, the nonmoving party. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir.2003).

5. The eventual Turnover Agreement, discussed *infra,* indicates that Mitsubishi Electric & Electronics USA, Inc., and Whelen Engineering Company, Inc., also may have had security interests in certain assets of CTA; however, neither party has raised these other interests as a material issue. (Marty Aff. Ex. A. at 3.)

a new bank. (*Id.* at 12.) However, CTA's attempts to secure a new lender failed. (*Id.*) CTA also initiated communications with various investors, most significantly, Arlington Capital, LLC. (*Id.* at 24.; Dep. of Bill A. Badie at 2–3.) Ultimately, Kevin Hamernik, a crisis consultant working with CTA at National City's request (Marty Dep. at 25–26), contemplated a Chapter 11 bankruptcy action for CTA if another solution to its financial difficulties failed to solidify (Decl. of David R. Smelko Ex. 1).

Much to CTA's relief, a letter of intent was entered into between CTA and Arlington Capital on December 10, 2003, which proposed that CTA's assets be purchased by two new entities owned by Arlington Capital: Scadata Ventures, LLC, and Wireless. (Marty Dep. Ex. 16.) Specifically, "the actual purchase [was] contemplated to be structured as a surrender of the [a]ssets by [CTA] to its secured lender, National City, followed by a private sale." (*Id.*) The letter of intent further contemplated cash contributions to Wireless by Guy Cayton and the subsequent sale of the ownership interests in Wireless to "the Cayton family." (*Id.*) Marty Cayton, as a part owner and President of CTA, actively involved himself in the negotiations of the terms of Arlington Capital's purchase of the CTA assets from National City.[6] (Marty Dep. Ex. 14, 15; Smelko Decl. Ex. 1.)

Wireless was organized with the Indiana Secretary of State on December 8, 2003. (Eilbacher Decl. Ex. 1.) The Operating Agreement for Wireless shows the ownership of Wireless as of December 12, 2003, as 75% by Arlington Capital and 25% by Guy Cayton. (Guy Aff. Ex. E.) None of the Caytons were or are members of Arlington Capital. (Guy Aff. ¶ 11.)

On December 12, 2003, CTA, Marty Cayton, and National City entered into an Agreement Regarding Turnover of Collateral ("Turnover Agreement"), which noted that as of December 5, 2003, the outstanding principal balance of CTA's note to National City was $2,470,000 and that CTA was in default. (Marty Aff. Ex. A at 1–2.) The Turnover Agreement acknowledged that National City had accelerated the balance of the note and demanded immediate payment and the surrender of collateral from CTA and Marty Cayton, and that the value of the collateral did not exceed the outstanding sum of CTA's indebtedness to National City.[7] (*Id.*) The Turnover Agreement further provided that, after CTA's surrender, National City would sell the collateral to Wireless and Scadata for a purchase price of $1,121,000. (*Id.*) In conjunction with the execution of the Turnover Agreement, Marty Cayton was released from his personal guaranty for

6. The December 10, 2003, letter of intent superceded a previous letter of intent in the record (unsigned) dated September 3, 2003, that described a similar proposed transaction whereby the equity owners of CTA would receive options or warrants to purchase up to 35% of the ownership interests in the new entity upon such time that the new entity had "successfully dealt with [CTA's] creditors." (Marty Dep. Ex. 8 at 2.) This letter of intent also included a call right and put right as to the ownership interests in the new entity, both provisions enabling the purchase by CTA's owners of Arlington Capital's interests in the new entity. (*Id.* at 2–3.) No reference to the involvement of Guy Cayton was contemplated in the September 3, 2003, letter of

intent. On September 3, 2003, Marty Cayton sent an e-mail to the employees of CTA announcing CTA's execution of a letter of intent with a local investment firm (Arlington Capital) stating that the principals "believe this investment will be the catalyst the company has been looking for to shore up equipment fulfillment and strengthen the overall business." (Marty Dep. Ex. 10.)

7. While the Turnover Agreement and Marty Cayton (Marty Aff. ¶ 8) both claim that this demand for payment and surrender of collateral by National City occurred prior to the date of the Turnover Agreement, the record contains no document evidencing such a demand.

$250,000 of the debt to National City (Marty Dep. at 21), and Marty, Dean, and Tony Cayton each obtained an employment contract with Wireless (Eilbacher Decl. Ex. 1).[8]

On the same day, National City and Wireless entered into a Purchase Agreement, wherein Wireless purchased the CTA assets for $1,000,000.[9] (Guy Aff. Ex. A.) The business of CTA was never offered for sale to the public and there was never a formal appraisal of the business, although CTA's crisis consultant estimated the value to be between $1,200,000 and $1,800,000. (Marty Dep. at 25–26.) In order to finance the purchase of the CTA assets from National City, Guy Cayton advanced $575,000 to Wireless, and Wireless executed two promissory notes payable to Guy in the same aggregate amount, which are due and payable in 2008.[10] (Guy Aff. Ex. C.) The remainder of the purchase price was paid in cash to National City by Arlington Capital. (Guy Aff. ¶ 11.)

As a condition of the December 12, 2003, transaction, Guy, Marty, Tony, and Dean Cayton entered into a Wireless Equity Transfer Agreement with Arlington Capital (the "Transfer Agreement"). (Guy Aff. Ex. F.) The purpose of the Transfer Agreement was to identify the conditions upon which the equity ownership interest of Wireless would transfer from Arlington Capital to Guy Cayton "and/or the Caytons." [11] (Id.) Guy, Marty, Tony, and Dean Cayton each "made individual representations and warranties in the Transfer Agreement in connection with the contemplated transfer of the equity ownership interest of Wireless." [12] (Id. at 8–9.)

Guy Cayton is the President and Chief Executive Officer of Wireless (Guy Aff. ¶ 16), and Marty Cayton is its Operations Manager (Marty Dep. at 23).[13] Wireless,

---

**8.** The Turnover Agreement references a Settlement Agreement among National City, the Bank and Marty Cayton, which may contain additional settlement terms, but this Settlement Agreement is not in the record. (Marty Aff. Ex. A at 3.)

**9.** Scadata paid the remaining $121,000 of the purchase price for the CTA assets. (Badie Dep. at 11.) Kevin Stock and Thomas Murphy are affiliated with Scadata, not Wireless. (Marty Dep. at 7–8.) Scadata is not a defendant in this action.

**10.** The promissory notes issued to Guy Cayton by Wireless, one in the amount of $175,000 and the other in the amount of $400,000 (Guy Aff. Ex. C), were secured by a lien on the assets of Wireless and personally guaranteed by Arlington Capital (Guy Aff. ¶ 15). The $400,000 promissory note was contingent upon the closing of the sale of Guy Cayton's home and Guy repaying to Wireless a note in favor of Wireless dated December 17, 2003, in the amount of $400,000 that Guy executed when the sale of his home, a source of his capital, failed to close prior to the CTA closing. (Id. ¶¶ 9, 12; Guy Aff. Ex. B, D.) In January, 2004, Guy Cayton closed on the sale of his home and paid to Wireless the amount due under the $400,000 promissory note dated December 17, 2003. (Id. ¶ 13.)

**11.** The term "the Caytons" is defined in the Transfer Agreement as collectively Marty, Tony and Dean Cayton. (Guy Aff. Ex. F at 2.)

**12.** The Transfer Agreement references an Asset Purchase Agreement among Wireless, CTA, Kevin Stock, Thomas Murphy, Marty Cayton, Tiger Tail Ventures, Inc., and Cross Development Group, Inc., dated of even date with the Transfer Agreement, which may contain additional terms regarding the purchase, but the Asset Purchase Agreement is not in the record. (Guy Aff. Ex. F at 8.) The Transfer Agreement does not indicate that National City was a party to the Asset Purchase Agreement, which is notable considering it was the seller of the CTA assets to Wireless.

**13.** The Operating Agreement of Wireless Ventures, LLC identifies Family First, LLC, as the sole manager of Wireless. (Guy Aff. Ex. E at 9.) The manager has the authority to appoint and remove the officers of Wireless. (Id. at 11.) The ownership and officers of Family First are not in the record, but it can be

like CTA, adopted the assumed name of "Amerizon Wireless," which was registered by Wireless with the Indiana Secretary of State on March 12, 2004. (Eilbacher Decl. Ex. 1.) Wireless operates at the same physical location where CTA conducted its business (Dep. of Guy Cayton ("Guy Dep.") at 9–11), and this business location never closed its doors for any period of time due to the transaction (Marty Dep. at 23). The sign on the front lawn of the business says "Amerizon," where prior to the December 12, 2003, transaction, it said "D & L Communications." (*Id.* at 17.) Wireless adopted CTA's telephone number (Guy Dep. at 14), and its website bears some similarity to CTA's website, including promotion of the name "Amerizon" (Eilbacher Decl. Ex. 1). Certain CTA personnel continue to be employed by Wireless,[14] and any change to CTA's products occurred over a period of time, not immediately after the December 12, 2003, transaction.[15] (Guy Dep. at 12.) Wireless's business plan included assuming approximately $1,200,000 of CTA's outstanding accounts payable to certain unsecured creditors; however, Glentel was not one of the assumed accounts. (Eilbacher Decl. Ex. 1.)

On or about December 15, 2003, CTA sent a memorandum to certain suppliers, including Glentel, informing them that "the company was recently forced to [sell] its assets and end its operations when the main secured lender, National City Bank, called its note due." (Marty Dep. Ex. 3.) On December 31, 2003, CTA filed Articles of Dissolution with the Indiana Secretary of State. (Eilbacher Decl. Ex. 1.)

Guy Cayton's role has remained the same since the execution of the Operating Agreement of Wireless: he continues to be responsible for the day-to-day operations of the business (Guy Aff. ¶ 16), and he is physically present on a daily basis (Marty Dep. at 24). Marty, Dean, and Tony Cayton are employees of Wireless, but Kevin Stock and Thomas Murphy are not. (*Id.* at 7.) Wireless does not hold itself out to the public as CTA or as the successor to CTA (Guy Aff. ¶ 18); to the contrary, it has notified its vendors and customers that it is a different entity than CTA and has different management (*id.* ¶ 19).

As to current ownership, Guy Cayton has since become the owner of 90% of the outstanding interests in Wireless, with Arlington Capital owning the remaining 10%. (Eilbacher Decl. Ex. 1 (Defs.' Resp. to Pl.'s Interrogs. ¶¶ 6, 7).) Wireless's two promissory notes payable to Guy Cayton in the aggregate amount of $575,000 remain outstanding. (Guy Dep. at 18.) Guy Cayton and his spouse have a joint will, naming their three sons, Marty, Dean, and Tony Cayton, as their heirs. (*Id.* at 24–25.)

## III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any

---

reasonably inferred from the context that Family First is an entity controlled by Arlington Capital.

14. While the record shows that the Caytons and Randy Heaton, the general manager of CTA's North Carolina operations, are employ-

ees of Wireless, Glentel has not shown that any other CTA employees became Wireless employees. (Marty Dep. at 13.)

15. The parties disagree as to whether Wireless produces substantially similar products to CTA.

material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst,* 24 F.3d 918, 920 (7th Cir.1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne,* 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION[16]

### A. *Wireless Is Not Liable to Glentel under Successor Liability as a Purchaser of CTA's Assets*

Glentel contends that Wireless is a mere continuation of CTA and is liable as a successor for the judgment which Glentel obtained against CTA. Because Wireless purchased the CTA assets from National City following an agreed turnover of collateral, the Court must first examine a threshold issue: whether a claim of successor liability against a purchaser of assets is precluded when the purchaser has obtained the assets following a commercially reasonable disposition of collateral under the Uniform Commercial Code (UCC).[17]

### 1. *Purchasing Assets at a Sale under the UCC Does Not Preclude a Claim of Successor Liability*

Indiana Code Section 26-1-9.1-617 states that "(a) A secured party's disposition of collateral after default ... discharges any subordinate security interest or other subordinate lien. (b) A transferee that acts in good faith takes free of the rights and interests described in subsection (a). ..." A claim of successor liability[18] must be examined in light of the UCC's intent to discharge subordinate interests and liens.

In *EEOC v. SWP, Inc.,* this Court, applying Indiana law, stated that "[t]he mere fact that the transfer of assets involved foreclosure on a security interest will not insulate a successor corporation from liability where other facts point to continuation." 153 F.Supp.2d 911, 924 (N.D.Ind. 2001) (quoting *Stoumbos v. Kilimnik,* 988 F.2d 949, 962 (9th Cir.1993)). While *SWP* involved a claim of successor liability in an employment discrimination context rather than a commercial law context, it accurately reflects the general rule that an intervening disposition of collateral under the UCC does not preclude successor liability.

In *Kaiser Foundation Health Plan of the Mid–Atlantic States v. Clary & Moore,*

---

**16.** Neither party directly addresses the question of which state's law should apply to this case. However, the parties apparently agree that Indiana law should apply, as they both cite numerous Indiana authorities. The Court therefore applies Indiana law.

**17.** Indiana Code Section 26-1-9.1-610(b) requires that:

> Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or

more contracts, as a unit or in parcels, and at any time and place and on any terms. Glentel has not alleged wrongdoing by National City and has not pursued its initial claim that CTA's assets were sold for less then their reasonably equivalent value.

**18.** Successor liability is a claim derived from equitable principles, *Ninth Ave. Remedial Group v. Allis–Chalmers Corp.,* 195 B.R. 716, 727 (N.D.Ind.1996), and is an exception to the general rule that a purchaser of assets is not liable for debts and liabilities of the seller. *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1233 (Ind.1994).

*P.C.*, a commercial debt case, the Fourth Circuit, applying Virginia law, rejected the defendant's argument that because the assets of a law firm transferred at a public foreclosure sale, the sale was then necessarily a bona fide arm's-length transaction and beyond reproach. 123 F.3d 201, 207–208 (4th Cir.1997). The court considered the factors surrounding the sale and concluded that the new entity was a mere successor to the prior entity and, therefore, was liable for the judgment secured against the prior entity by the plaintiff. *Id.* at 209.

Similarly, in *Glynwed, Inc. v. Plastimatic, Inc.*, the District of New Jersey, applying New Jersey law, held that a corporation which purchased the assets of another corporation was liable for a commercial debt of the selling corporation, even though the sale of assets occurred pursuant to a foreclosure sale. 869 F.Supp. 265, 278 (D.N.J.1994). The court illustrated the important distinction that a good faith purchaser pursuant to a sale under the UCC takes assets free of any security interest in the collateral, but is not precluded from a claim of successor liability. *Id.*

> [N]othing in the UCC supports Danco/Plastock's argument that the 9–504 sale provides a safe harbor against successor liability claims. Glynwed is not looking to enforce a lien on the assets that Danco/Plastock purchased at the foreclosure sale, but is asserting a claim of successor liability. Contrary to Danco/Plastock's assertions, this is a distinction with a difference.

*Id.* at 274.

█ Likewise in the case at hand, Glentel is not attempting to enforce a lien on the assets that Wireless purchased from National City; rather, it is pursuing a claim of successor liability to collect a debt. Defendants have failed to provide, and the Court has not discovered, authority that supports the preclusion of a claim of successor liability against a purchaser of assets at a sale under the UCC. Therefore, Glentel's claim of successor liability is not precluded by Ind.Code Section 26–1–9.1–617 and may proceed on the merits.

### 2. Glentel's Claim of Successor Liability Fails on the Merits

The Court must first examine under what circumstances a purchaser of assets may be held liable for the liabilities of the selling corporation under Indiana law.

█ In the sale of a corporation's stock, all of the liabilities and debts of the corporation stay with the corporation. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1233 (Ind.1994). In contrast, when a corporation purchases the assets of another corporation, the purchaser does not assume the liabilities and debts of the selling corporation. *Id.* There are four generally recognized exceptions to this rule: "(1) an implied or express agreement to assume the obligation; (2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is a de facto consolidation or merger; or (4) instances where the purchaser is a mere continuation of the seller." *Id.*

Glentel does not allege that the first exception applies, and the second exception, fraud, is considered in section B, *infra*, as a separate claim. Accordingly, this discussion focuses on the third and fourth exceptions.[19]

---

**19.** Some courts have analyzed the de facto merger and mere continuation exceptions together, stating that they "tend to overlap and no criteria can be identified that distinguish them in any useful manner." *Gallenberg*

*Equip., Inc. v. Agromac Int'l, Inc.*, 10 F.Supp.2d 1050, 1054 (E.D.Wis.1998) (applying Wisconsin law); *see also Glynwed*, 869 F.Supp. at 275.

### a. Discussion of the De Facto Merger and Mere Continuation Exceptions Under Indiana Law

In *Sorenson v. Allied Products Corp.*, a product liability case involving successor liability asserted against a purchaser of assets of a bankrupt manufacturer, the Indiana Court of Appeals identified the criteria for establishing a de facto merger as: "(1) continuity of ownership; (2) continuity of management, personnel, and physical operation; (3) cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; and (4) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor."[20] 706 N.E.2d 1097, 1100 (Ind.Ct.App.1999). The court in *Sorenson* ultimately did not find successor liability under the de facto merger exception, basing its decision on the following factors: (1) though stock of the successor was the consideration, it was distributed to the predecessor's secured creditors, not the predecessor's shareholders; (2) the predecessor's shareholders, because they did not own stock in the successor, never possessed the authority to fully participate in the management of the successor; (3) there was no continuity of upper-tier management; (4) the predecessor was never dissolved; (5) the successor did not assume the ongoing business liabilities of the predecessor; and (6) the successor hired less than 30% of the predecessor's employees. *Id.*

Additionally, in *Travis v. Harris Corp.*, a product liability case involving successor liability against a purchaser of assets, the Seventh Circuit, applying Indiana law, stated that a key factor in determining whether a de facto merger occurred is the transfer of stock as consideration. 565 F.2d 443, 447 (7th Cir.1977).

> Where the assets are sold for cash, no basic, fundamental change occurs in the relationship of the stockholders to their respective corporations, and absent continuity of shareholder interest, the two corporations are strangers, both before and after the sale. Thus, the question of whether cash or stock is given in consideration for the assets is really a question of ownership.

*Id.* (internal citations omitted). While the Seventh Circuit acknowledged the importance of considering the nature and consequences of the transaction, it declined to find a de facto merger in *Travis*, concluding that "[a]bsent a transfer of stock, the nature and consequences of a transaction are not those of a merger." *Id.*

█ In determining whether successor liability exists pursuant to the fourth exception (a mere continuation of the seller), the test is "not the continuation of the business operation, but rather the continuation of the corporate entity. An indication that the corporate entity has been continued is a common identity of stock, directors, and stockholders and the existence of only one corporation at the completion of the transfer." *Id.; see also Travis*, 565 F.2d at 447. In *Sorenson*, the court, as in its analysis under the de facto merger exception, did not find the defendant to be a mere continuation of the seller since (1) none of the predecessor's share-

---

**20.** Courts in various jurisdictions, including Indiana, have relaxed successor liability requirements in certain limited contexts, for example, to address injuries caused by defective products manufactured by a predecessor corporation or to vindicate policies incorporated in federal statutes in areas such as labor law, environmental law and employment discrimination law. *Gallenberg*, 10 F.Supp.2d at 1055; *see SWP*, 153 F.Supp.2d at 917 (discussing liberalized test in Indiana for successor liability in the area of employment discrimination law). However, courts have been reluctant to relax the requirements for successor liability in the commercial law context. *Gallenberg*, 10 F.Supp.2d at 1056.

holders owned stock in the defendant; (2) there were no common directors between the two entities; and (3) the predecessor corporation was never dissolved. 706 N.E.2d at 1100. Likewise, in *Travis,* the Seventh Circuit declined to find mere continuation of the seller, because the two entities (1) had no common identity of stock, stockholders or directors; (2) had only one common officer; and (3) existed as distinct entities for a week after the sale. 565 F.2d at 447.

### b. Successor Liability Cases in Other Jurisdictions

While *Sorenson* and *Travis* are controlling authority, they are not very helpful in resolving this case, as their facts are much more straightforward than the complex transaction at issue here. Therefore, the Court will consider relevant cases in other jurisdictions to provide a broader view of the law of successor liability.

For instance, several jurisdictions have taken a more relaxed view of successor liability. In *Glynwed,* the District of New Jersey, applying New Jersey law and analyzing the de facto merger and mere continuation exceptions together, stated that "[c]ontinuity of ownership, not uniformity, is the test." 869 F.Supp. at 277. The court determined that the ownership criteria was satisfied when shareholders who owned 35.1% and 32% of two predecessor corporations also became shareholders of the successor corporation, despite the presence of cash as consideration for the assets. *Id.* at 276–77. "Substantial continuity" among the officers and directors, together with the same general manager and sales manager, was sufficient to satisfy the continuity of management requirement. *Id.* at 276. The court in *Glynwed* considered crucial to its decision whether the intent of the parties was to effectuate a consolidation or merger rather than a sale of the assets. *Id.* at 277. Thus, a critical piece of evidence was a statement in the predecessor's investment memorandum stating: "[a]s Danco/Plastimatic is not in the financial position to meet both banks['] demands by finding a new financing source to repay their loans, the company was left with no alternative other than to organize a complete restructuring of the two companies. This restructuring will take the form of a 'secured party' sale." *Id.*

Similarly, in *Kaiser,* a creditor brought an action against a law firm to obtain payment of a judgment secured against its corporate predecessor, alleging that the law firm was a mere continuation of the predecessor. 123 F.3d 201. The Fourth Circuit, applying Virginia law, found "substantial overlap" in ownership, officers and directors between the two firms, and determined that "absolutely identical ownership between the two corporations need not be present." *Id.* at 206. The court, holding that the defendant was a mere continuation of its predecessor, stated:

> "We note that this is by no means a clearly settled rule of law. Nonetheless, we agree ... that form must not be elevated over substance in deciding the issue of successor liability. We cannot allow a corporation which, by all indications is under the same control as its predecessor, to avoid its legitimate debts by manipulating superficial indicia of ownership."

*Id.* (internal citations omitted).

Likewise, in *Fiber–Lite Corp. v. Molded Acoustical Products of Easton, Inc.,* the Eastern District of Pennsylvania, applying Pennsylvania law, found that the defendant was a mere continuation of the corporation whose assets it purchased at a foreclosure sale, when the defendant was an entity owned by the children of the sole shareholder of the predecessor corporation, and the children were unaware of their role in the transaction until a few days prior to closing. 186 B.R. 603, 609–

10 (E.D.Pa.1994). The court inferred from the evidence presented that the bank orchestrated the sale of the predecessor's assets to the successor corporation in order to keep its priority as a secured creditor and dispose of all of the predecessor's unsecured creditors, and concluded that the sale was not commercially reasonable and was entered into to escape liability from unsecured debt. *Id.* at 610.

Yet, other courts considering cases of successor liability have taken a more conservative stance, criticizing the outcome in cases such as *Glynwed* and *Fiber–Lite* for "unjustifiably relaxing the traditional test of successor liability" and importing "the continuity of enterprise doctrine from the product liability context into commercial law." *Gallenberg Equip., Inc. v. Agromac Int'l, Inc.,* 10 F.Supp.2d 1050, 1055 (E.D.Wis.1998); *see also G.P. Publications, Inc. v. Quebecor Printing—St. Paul, Inc.,* 125 N.C.App. 424, 481 S.E.2d 674, 682–83 (1997) (contending that the courts in *Glynwed* and *Fiber–Lite* applied a broader "substantial continuity" test without realizing that the rationale behind it was inapplicable in the commercial law context). The Eastern District of Wisconsin in *Gallenberg,* applying Wisconsin law and analyzing the de facto merger and mere continuation exceptions together, declined to find successor liability for obligations under a dealership agreement when the successor corporation, Agromac, managed the predecessor corporation, Lockwood, for three years under a management agreement and ultimately purchased its assets at a foreclosure sale when Lockwood failed. 10 F.Supp.2d at 1056–57. In response to plaintiff's assertion that "close ties" between Lockwood and Agromac should give rise to liability, the court stated that "close ties, without more, do not give rise to an inference of an intention to merge corporations or of the absence of an arm's length transaction." *Id.* at 1056. The plaintiff further argued

that the ownership requirement was satisfied because the shareholders of Agromac were really "de facto shareholders" of Lockwood. *Id.* The court rejected that argument as well, stating:

> This argument equates control with ownership. They are not the same, however, and unless there is evidence that the control was used in an inappropriate manner or towards an inappropriate end, it is not a basis for successor liability. If, for example, plaintiff could show that Agromac's control was used to effectuate a transaction involving inadequate consideration or the rejection of a superior offer or the evasion of the claims of creditors, successor liability might well attach. The evidence does not show that Agromac's control was used for such purposes.

*Id.* at 1056–57.

The court in *Gallenberg* refused to unduly expand the exceptions to the traditional rule of successor liability in order to preserve the policies behind that rule, that is, to prevent a chilling effect on potential purchasers who might acquire the assets of a foreclosed business and find themselves liable for debts they never intended to assume. *Id.* at 1056; *see also G.P. Publications,* 125 N.C.App. at 438, 481 S.E.2d 674. Ultimately, the court concluded the case as follows, emphasizing its adherence to the traditional rule:

> I am unable to find in the facts of this case a compelling reason for departing from the general rule of no successor liability. In the absence of continuity of ownership between Lockwood and Agromac, Agromac is not a mere continuation of Lockwood. Nor was the asset sale a merger in disguise. The asset sale in this case came about only after Agromac's efforts to revive the Lockwood business failed. The sale created an obligation on the part of Agromac to pay over $5 million. There is no evidence

that the transaction was not an arm's length deal. Thus, Agromac cannot be held to Lockwood's dealership arrangement with Gallenberg.

*Gallenberg,* 10 F.Supp.2d at 1057.[21]

In summary, Indiana courts have adhered closely in the commercial law context to the traditional criteria for establishing the de facto merger and mere continuation exceptions of successor liability identified in *Sorenson* and *Travis.* However, there are few Indiana cases involving successor liability in the commercial law context. Some courts outside of Indiana, when faced with successor liability claims in the commercial law context, have relaxed the traditional criteria of successor liability to prevent decisions that would seem to elevate form over substance. Yet, other courts have criticized those decisions, arguing that they undermine the general policy of encouraging the productive use of economic assets through free alienability. *Id.* at 1053.

### c. Application of the Law of Successor Liability to the Facts in this Case

■ In examining the facts of this case under the criteria identified in the de facto merger and mere continuation exceptions, certain criteria are easily satisfied.

It is undisputed that Wireless assumed a significant portion of CTA's accounts payable liabilities, which satisfies one element required under the de facto merger exception. As to dissolution, a necessary element under both exceptions, CTA was voluntarily dissolved on December 31, 2003, just fourteen days after the transfer of CTA's assets.

As to continuity of management,[22] personnel, and physical operation, an element under the de facto merger exception, Wireless operates from the same physical location as CTA did, using the same telephone number. However, Wireless's Operating Agreement shows Family First, LLC, as the sole manager of Wireless; no evidence has been presented by Glentel that Family First is an entity owned or controlled by the Caytons, or that it had any prior managerial relationship with CTA. Moreover, Guy Cayton, who was not a manager of CTA, is the Chief Executive Officer and President of Wireless, and Glentel has not controverted Defendants' evidence that he runs the company on a day-to-day basis. Although Marty Cayton was the President of CTA and is now the Operations Manager of Wireless, Glentel has failed to produce evidence as to other significant common management between CTA and Wireless.[23] Furthermore, Glen-

21. At the same time that it expressed deference to the traditional rule, it also cautioned that alleged successor entities will be closely scrutinized and will not escape liability by merely manipulating the technicalities of a transaction:

> Courts will give close scrutiny to corporate realities, not mechanical application of a multi-factor test. If the transaction is not an arm's-length affair, courts may impose successor liability, not only to protect innocent victims, but also because the policies underlying the general rule no longer apply. Absolving corporate responsibility for the acts of others and allowing easy transferability of corporate assets do not apply to an asset sale which is not a bona fide transaction between separate parties. Continui-

ty of ownership is the common thread in both exceptions claimed by the plaintiff. Continuity of ownership strongly suggests the absence of a bona fide transaction....
*Gallenberg,* 10 F.Supp.2d at 1054 (internal citations omitted).

22. Since Wireless has a "manager" rather than "directors," as is consistent with limited liability companies, the Court has considered the "director" element of the mere continuation exception under its discussion of management. Ind.Code § 23–18–1–14.

23. While the record shows that Dean Cayton, Tony Cayton and Randy Heaton became employees of Wireless, Glentel has not provided evidence as to the similarity of their past

tel has also not shown that any employees of CTA continued in employment with Wireless, other than the Caytons and Randy Heaton.

As to continuity of ownership under the de facto merger exception, and common identity of stock and stockholders [24] under the mere continuation exception, Guy Cayton, the father of three of the five owners of the parent entities of CTA, ultimately became the owner of 90% of the interests of Wireless.[25] There is no doubt that a transaction should be closely scrutinized when a family member of a predecessor entity's shareholders becomes the owner of its successor entity, especially when the initial impetus for the transaction was to restructure the debt or secure the investment of additional capital for the predecessor entity.

Nonetheless, while the familial connection justifiably arouses suspicion, it is not enough to create successor liability. Guy Cayton is an individual separate and distinct from his three sons and the other prior owners of CTA. Glentel has presented no evidence that Guy Cayton was an owner or executive of CTA; rather, he served as an employee. Nor is there evidence that Guy Cayton is a mere figurehead at Wireless; he runs the company day to day, and he appears to have the experience and knowledge necessary to own a telecommunications company, as he did precisely that earlier in his career in North Carolina. Moreover, Guy Cayton placed $575,000 of his personal funds at risk to enable Wireless to purchase CTA's assets through Arlington Capital, a feat

that his three sons could not accomplish on their own. Furthermore, there is no indication that the negotiations with National City were other than arm's-length negotiations. In short, other than the familial connection, there is no continuity of ownership or common identity of stock or stockholders between CTA and Wireless, elements required by the *Sorenson* and *Travis* decisions.

It is well established that a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir.1997). Here, Glentel has failed to produce sufficient evidence to show (1) continuity of ownership, management and personnel, elements necessary to establish a de facto merger; and (2) the common identity of "stock, directors and stockholders," elements necessary to establish a mere continuation. It may be that Guy Cayton invested in Wireless purely to spare his three sons from bankruptcy and professional embarrassment, so that they may continue in the telecommunications business. Nonetheless, this Court declines to extend the reach of successor liability to penalize him solely because he is the father of the prior shareholders of CTA, especially when (1) his relationship with Wireless arose via arm's-length negotiations with National City, which is not accused of any wrongdoing by Glentel; (2) Glentel has not pursued a claim that the CTA assets were transferred for less then their reasonably equivalent value; (3) it is

managerial roles with CTA and their current roles with Wireless.

24. In a limited liability company, the equivalent of stock is "interests" and the equivalent of stockholders are "members." Ind.Code §§ 23–1–18–10, 15.

25. The Court rejects Defendants' argument that Arlington Capital was the sole owner of

Wireless at closing, inferring that the ownership inquiry should end there. The obvious intent of the parties, as memorialized in the Transfer Agreement, was that Guy Cayton or other members of the Cayton family would ultimately own Wireless, and Guy Cayton, in short order, has done exactly that.

not disputed that he runs the day-to-day operations of Wireless as its President and Chief Executive Officer, and has the experience and qualifications necessary to do so; and (4) he placed $575,000 of his personal funds at risk for Wireless to make the transaction viable. Thus, the Court finds as a matter of law that successor liability cannot be imposed on Wireless.

### B. Glentel's Fraud Claims Fail

Glentel alleges that the sale of assets by CTA was fraudulent and for the purpose of avoiding its liabilities, including its debt to Glentel. This vague allegation could be construed as a claim of fraud, fraudulent conveyance or constructive fraud against Defendants. For completeness, the Court will examine the substance of Glentel's claims under each theory.

#### 1. Glentel's Claim of Actual Fraud Fails

■■■■ The elements of actual fraud are "a false material representation of past or existing facts, made with knowledge or reckless ignorance of the falsity, which causes reliance to the detriment of the person relying on the representation." *Comfax Corp. v. N. Am. Van Lines, Inc.,* 587 N.E.2d 118, 125 (Ind.Ct.App.1992). Glentel supports this claim by merely asserting that CTA attempted to mislead its creditors by stating in its December 15, 2003, communication to certain suppliers that CTA "was recently forced to [sell] its assets and end its operations when the main secured lender, National City Bank, called its note due." (Marty Dep. Ex. 3.) Glentel asserts this was misleading because (1) CTA turned over, rather than sold, its assets to National City; and (2) CTA continued its business operations as Wireless. (Resp. to Defs.' Mot. for Summ. J. at 8-9.) But, Glentel fails to explain how this alleged mischaracterization (1) was material; or (2) caused detrimental reliance by Glentel. Therefore, Glentel has failed to produce evidence that sub-

stantiates a claim of actual fraud against Defendants.

#### 2. Glentel's Claim of Fraudulent Conveyance Fails

The Indiana Fraudulent Transfer Act, Ind.Code § 32–18–2–1 to 21, provides that "[a] transfer made ... by a debtor is fraudulent as to a creditor ... if the debtor made the transfer ...:(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer...." Ind.Code § 32–18–2–14. As noted earlier, Glentel does not challenge the value received for the sale of the CTA assets, so subsection (2) is inapplicable. Furthermore, even if Glentel had directly challenged the value exchanged for the CTA assets, the evidence in the record of arm's-length negotiations between Arlington Capital and National City indicates that reasonably equivalent value for CTA's assets was exchanged.

Accordingly, the only issue is whether Defendants had intent to hinder, delay or defraud their creditors, an inquiry also necessary under the second exception of the successor liability analysis in *Winkler.* Glentel invokes the test for fraudulent intent set forth in *Lee's Ready Mix & Trucking, Inc. v. Creech:*

> Fraudulent intent can be inferred from certain indicia called 'badges of fraud.' Some of the badges from which fraudulent intent can be inferred include: 1) the transfer of property by a debtor during the pendency of a suit; 2) a transfer of property that renders the debtor insolvent or greatly reduces his estate; 3) a series of contemporaneous transactions which strip the debtor of all property available for execution; 4) secret or hurried transactions not in the usual mode of doing business; 5) any

transaction conducted in a manner differing from customary methods; 6) a transaction whereby the debtor retains benefits over the transferred property; 7) little or no consideration in return for the transfer; and 8) a transfer of property between family members. When there is a concurrence of several badges of fraud an inference of fraudulent intent may be warranted. However, no one badge of fraud constitutes a per se showing of fraudulent intent. Rather, the facts must be taken together to determine how many badges of fraud exist and if together they constitute a pattern of fraudulent intent.

660 N.E.2d 1033, 1037 (Ind.Ct.App.1996) (internal citations omitted); *see also Indianapolis Ind. Aamco Dealers Adver. Pool v. Anderson,* 746 N.E.2d 383, 390–391 (Ind.Ct.App.2001). Glentel supports its contention of fraudulent intent with assertions that (1) the transaction differed from customary methods, (2) the CTA principals failed to "move on" after the asset surrender, and (3) Marty Cayton was actively involved in the negotiations between Arlington Capital and National City. (Resp. to Defs.' Mot. for Summ. J. at 14–15.)

This Court's examination of the record reveals that certain facts may, when taken in isolation, give the appearance that several badges of fraud exist in this case. First, the transaction with National City occurred in December, 2003, during the pendency of Glentel's initial suit against CTA,[26] and the transaction with National City left CTA with no assets to satisfy the eventual judgment. Furthermore, Marty, Dean, and Tony Cayton undoubtedly benefit currently from their employment by Wireless and stand ready to perhaps inherit the ownership of Wireless one day.

Most significantly, the transfer of property in this case was, despite Arlington Capital's role, ultimately between Cayton family members.

■ However, the facts, when taken together, reveal that Defendants had no fraudulent intent. CTA became unable to pay its debts as they became due. It sought lenders and investors to help with its situation, but no third party would lend to, or invest in, CTA in its current financial condition. Undoubtedly, National City had a security interest in all of CTA's assets and was owed a debt by CTA greater than the worth of its assets, giving it a right to foreclose and pursue CTA's collateral when CTA was unable to pay National City. The negotiations between Arlington Capital and National City suggest those of an arm's-length transaction,[27] and Glentel has not pursued its initial assertion that the CTA assets were valued at less than their reasonably equivalent value. Moreover, the Wireless deal would not have been done without Guy Cayton and Arlington Capital extending significant capital to Wireless to make the purchase of the CTA assets possible. No evidence has been presented that Guy Cayton does not act as the President and Chief Executive Offer and run the day-to-day operations of Wireless.

Furthermore, in the event that the transaction with Wireless had not occurred, CTA would likely have filed bankruptcy. Glentel has failed to show the Court how it, as an unsecured creditor who obtained a judgment, would have fared differently since National City had a security interest in all of CTA's assets and was owed a debt almost twice the value of CTA's assets. *See Rice v. Comm'r,* 782

26. Glentel's initial claim was filed on October 17, 2003, and judgment by this Court was rendered on April 16, 2004.

27. It is notable that neither National City nor Arlington Capital was named by Glentel as a defendant in this action.

N.E.2d 1000, 1004 (Ind.Ct.App.2003) (quoting *Beavans v. Groff,* 211 Ind. 85, 5 N.E.2d 514, 516 (1937)) ("an action to set aside a fraudulent conveyance does not negate the disputed transaction; its only effect is to subject the conveyed property to execution 'as though it were still in the name of the grantor.' "); *see generally Dupont Feed Mill Corp. v. Wells Fargo Bank,* 121 B.R. 555, 562 (S.D.Ind.1990) ("a secured creditor with a properly perfected security interest in collateral takes priority over the interests of the trustee in bankruptcy"); *KeyBank Nat'l Assoc. v. Michael,* 737 N.E.2d 834, 850 (Ind.App.2000) ("relative rank of claims and the standing of liens remain unaffected by a receivership").

In sum, Glentel has failed to produce sufficient evidence that Glentel was acting with fraudulent intent to evade debts owed to unsecured creditors, rather than to simply satisfy its liabilities to National City, its largest secured creditor who was in a position of priority. Therefore, Glentel's claim that fraudulent intent was present, whether for purposes of a fraudulent conveyance claim or to satisfy the second exception to the general rule in *Winkler* (a fraudulent sale of assets for the purpose of escaping liability), fails.

### 3. Glentel's Claim of Constructive Fraud Fails

 The elements of constructive fraud are: "a duty existing by virtue of the relationship between the parties, representations or omissions made in violation of that duty, and a reliance on the representation or omission by the individuals to whom the duty is owed to the detriment of those individuals." *Comfax,* 587 N.E.2d at 125. In constructive fraud, "the law infers fraud from the relationship of the parties and the circumstances which surround them." *Id.*

 While Glentel contends that it was owed a fiduciary duty by Defendants as its creditor, which is addressed in the next section of this opinion, Glentel has presented no evidence as to the representation or omission by Defendants that Glentel allegedly relied upon, or how it was harmed by its reliance on such representation or omission. Therefore, the claim fails.

### C. Glentel's Claim of Breach of Fiduciary Duty by the Individual Defendants Fails

 Glentel has asserted that the individual Defendants, as owners of CTA, are personally liable to Glentel because they breached a fiduciary duty owed to Glentel as a creditor of CTA. Defendants allegedly breached this duty by failing to pursue and realize a maximum price for CTA's assets, choosing to pay some creditors' debts over others, and paying a significant fee to Arlington Capital for its role in the transaction. While Glentel has cited various cases, primarily from other jurisdictions, recognizing a fiduciary duty owed to creditors upon insolvency, it is unnecessary for this Court to decide the point. Even if a fiduciary duty does arise between a debtor and its creditors at the point of a debtor's insolvency, Glentel has failed to demonstrate how CTA acted inappropriately toward its creditors in this case.

CTA owed a debt to National City much larger than the value attached to its assets, and National City had a security interest in all of CTA's assets. Preference was given to National City by CTA as its largest secured creditor, and rightly so. When Glentel chose to conduct business with CTA as an unsecured creditor, it knowingly took on a risk of nonpayment and exclusion in favor of a secured creditor, a point generally illustrated in *Nappanee Canning Co. v. Reid, Murdock & Co.*:

> When asked to extend credit to it, all persons dealing with the corporation know that if it is, or thereafter becomes, insolvent, the whole of its property may

be applied to pay or secure debts due to favored creditors ... and that the claims of all other creditors may be excluded and consequently lost. If, with this knowledge, credit is given, it cannot be said that preferences subsequently conferred upon other creditors have violated any right which the law gave to the creditor whose claim was left unpaid and unsecured.

159 Ind. 614, 64 N.E. 870, 872–73 (1902); *see also Abrahamson v. Levin,* 162 Ind. App. 304, 319 N.E.2d 351, 354–55 (Ind. App.1974) (en banc); *see generally Giffin v. Edwards,* 708 N.E.2d 876, 880 (Ind.Ct. App.1999) (secured creditor's rights take priority over rights of bankruptcy trustee representing unsecured creditors).

Furthermore, the owners of Wireless infused significant additional capital to Wireless, which put Wireless in a position to satisfy more creditors than CTA ever could have in light of its financial difficulties. While the decision by Wireless to assume certain CTA debts may or may not have ultimately been the best decision when weighing the business benefits against the costs of this lawsuit, Wireless had the right to make such a decision and, by making it, did not breach any purported fiduciary duty owed by the individual Defendants toward Glentel. Therefore, since Glentel has failed to provide sufficient evidence to establish a claim of breach of fiduciary duty, summary judgment is appropriate in favor of Defendants on this claim.

## V. CONCLUSION

Glentel's motivation for bringing this suit is understandable; the end result of the transaction with Wireless was to render Glentel's $242,266.92 judgment against CTA worthless. The Court can empathize with Glentel's plight; nonetheless, it cannot provide a remedy. As a matter of law, Glentel's scant evidence is insufficient to create successor liability against Wireless. As Glentel has learned the hard way, extending unsecured credit is a risky business and relief in court is difficult to obtain.

For the reasons stated herein, Defendants' motion for partial summary judgment is GRANTED.[28]

---

28. Also pending is Plaintiff's motion to strike an affidavit and, in the alternative, motion for leave to respond. (Docket # 48, 49.) As this Memorandum of Decision and Order does not rely on the affidavit Plaintiff seeks to strike, Plaintiff's motion to strike and, in the alternative, motion for leave to respond, is DENIED as MOOT.