GALLENBERG EQUIPMENT,
INC., Plaintiff,

v.

AGROMAC INTERNATIONAL,
INC., Defendant.

No. 96–C–991.

United States District Court,
E.D. Wisconsin.

Aug. 12, 1998.

Ann L. Smith, Tuchscherer & Smith, for Plaintiff.

Rent. J. Carrell, Lawton & Cates, Madison, WI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

This case is about corporate successor liability. In general, a corporation that purchases the assets of another corporation does not succeed to the seller's liabilities. However there are exceptions to the general rule. The question in the case is whether the dealership agreement between plaintiff, Gallenberg, and the defendant predecessor, the Lockwood Company, is within one of the exceptions and therefore binding on the defendant Agromac. I hold that it is not.

## I. FACTUAL BACKGROUND

Plaintiff Gallenberg Equipment, Inc., a Wisconsin corporation located in Antis Wisconsin, is in the business of selling farm equipment. In 1989 plaintiff entered into a dealership agreement with Lockwood, a Delaware manufacturing company with principal place of business in Nebraska.

In the early 1990s Lockwood began to experience serious financial problem Lockwood's CEO, board chairman and major stockholder, Clifton McCall, whose into in running the company had waned, began to look for someone with the ability to manage the company and hopefully to engineer a financial turnaround.

Two individuals, Bruce Wood and Joe Schon, who owned a different farm equipment company known as Agromac,[1] heard about Lockwood's problems and approached McCall about managing Lockwood. McCall agreed that Wood and Schon would run Lockwood, and on August 4, 1992 Agromac entered into a management services contract with Lockwood. Wood became president of Lockwood and a board member and Schon became vice-president. The two of them embarked on the task of reviving Lockwood as a money-making operation.

Because of its considerable debt, however, in January 1993 Lockwood petitioned for bankruptcy in the District of Nebraska. Shortly thereafter the Agromac/Lockwood Management Agreement was terminated, although Wood and Schon continued to run Lockwood, Wood as president and CEO and Schon as vice-president. In December 1993 Schon succeeded McCall as a board member and Wood became Chairman of the Board. While in bankruptcy, Lockwood operated under court protection from creditors with an interim loan from Norwest Bank. Norwest became Lockwood's principal creditor.

During the bankruptcy proceeding Lockwood proposed a number of reorganization plans designed to bring it out of bankruptcy and maintain it as a going concern. At least some of these plans involved selling Lockwood stock to Agromac. If any of the plans had been approved and ultimately succeeded, Lockwood's contracts and other obligations, including presumably the dealership agreement with Gallenberg, would have remained in effect. However, as a result of objections from unsecured creditors, the bankruptcy court rejected the proposed reorganization plans.

In November 1995 Lockwood asked the bankruptcy court for permission to carry out a sale of its assets pursuant to section 363 of the Bankruptcy Code, and Agromac submitted an offer to purchase them. Because of objections, however, the bankruptcy court refused to approve the sale. The court expressed concern that its non-approval might result in Norwest foreclosing on its security and forcing a fire sale of Lockwood's assets. Nevertheless, the bankruptcy court determined that the proposed sale was unfair to bidders other than Agromac because Lockwood had provided insufficient financial information to enable potential buyers to evaluate the assets and decide whether they were worth bidding for at a price similar to or higher than the Agromac bid. The court, therefore, refused to approve the sale.

As the court predicted, after this decision Norwest seized and secured Lockwood's assets and prepared to sell them. Lockwood ceased to operate. On December 29, pursuant to section 9–501 of the Nebraska Uniform Commercial Code, Norwest sold Lockwood's assets at a secured party open auction sale. Agromac was the only bidder on the

---

1. Wood and Schon owned both Agromac Manufacturing, Inc. and its subsidiary, Agromac International, Inc. For purposes of this decision, there is no reason to differentiate between the companies. I will refer to both as "Agromac."

bulk assets of Lockwood, although another company bid on the irrigation product line.

Agromac purchased Lockwood's assets for $5,475,000. The Secured Party Asset Sale Agreement, which governed the transaction, stated that Agromac did not assume any of Lockwood's obligations or liabilities. Although by this time shares of Lockwood stock were worthless, no stock changed hands as part of the sale. Agromac began to operate the Lockwood business.

During these difficult financial years, Gallenberg continued as a Lockwood dealer. In November 1995 Lockwood wrote to Gallenberg and other dealers thanking them for their loyalty and expressing hope that Lockwood's situation would be improving. In January 1996 an Agromac representative met with Gallenberg and presented a proposed written dealership agreement which Gallenberg executed. Agromac, however, did not sign the agreement and on March 5, 1996 advised Gallenberg that it had chosen another dealer to represent Agromac in Wisconsin.

Gallenberg then brought this lawsuit contending (1) Agromac was bound by Lockwood's dealership arrangement with Gallenberg under a theory of successor liability, and (2) Agromac violated the Wisconsin Fair Dealership Law (WFDL), Wis. Stat. § 135.01 et. seq., which prohibits a franchisor from terminating a dealership or substantially changing the competitive circumstances of a dealership agreement without good cause. I have diversity jurisdiction over the case as the parties come from different states and the amount in controversy exceeds $75,000.

Both Gallenberg and Agromac move for summary judgment although Gallenberg limits its motion to the issue of liability. Agromac also raises the question as to whether Gallenberg's moving papers are adequate in the absence of an affidavit verifying various exhibits. Agromac, however, does not dispute the authenticity of Gallenberg's exhibits, most of which were produced by Agromac in response to discovery requests. Under these circumstances, Gallenberg's submission does not violate Federal Rule of Civil Procedure 56(c) and I will consider its motion.

## II. SUMMARY JUDGMENT STANDARD AND CHOICE OF LAW DISCUSSION

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The parties in this case have filed cross-motions for summary judgment and agree that for purposes of their motions no material facts are contested. When no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir.1996). In fact, both parties agreed at oral argument that the case turns on how the law applies to the facts, and that summary judgment was the appropriate vehicle for resolving the critical issue in the case, that of successor liability.

When a federal court sits in diversity jurisdiction pursuant to 28 U.S.C. § 1332, as here, it applies state substantive law. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 426, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, to decide which state's substantive law to apply to the merits of the case, I look to Wisconsin choice of law rules. However, I need not apply choice of law rules at all unless the parties point to an outcome-determinative difference among potentially applicable state laws. *Ziolkowski v. Caterpillar, Inc.*, 800 F.Supp. 767, 778 (E.D.Wis.1992).

In this case both parties treat Wisconsin substantive law as applicable and neither suggests applying the law of any other state. The asset purchase agreement between Lockwood and Agromac contains a forum selection clause specifying that Nebraska law applies to disputes between the parties arising out of the contract, but Gallenberg is not a party to that contract, and forum selection clauses are entitled to less weight if third party litigants are involved. *Allstate Ins. Co.*

*v. Hague,* 449 U.S. 302, 328, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (Stevens, J., concurring). Moreover, the common law from state to state on the issue of successor liability is similar, and there is no difference between Wisconsin and Nebraska law.

As a result, I will apply Wisconsin substantive law. Because, however, there are few applicable Wisconsin cases, I will—as the parties have—also refer to federal cases and authority from other states where useful. *See King v. Damiron Corp.,* 113 F.3d 93, 95 (7th Cir.1997) (absent guidance from any state courts, federal courts may look to other jurisdictions to predict how the highest state court would decide the issue).

## III. ANALYSIS

 Do the rules of successor liability require Agromac to honor the dealership agreement between Lockwood and Gallenberg? The general rule in the majority of states, including Wisconsin, is that in a commercial context a corporation that purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. *Leannais v. Cincinnati, Inc.,* 565 F.2d 437 (7th Cir.1977). Important policies underlie the general rule. First, the rule accords "with the fundamental principle of justice and fairness, under which the law imposes responsibility for one's own act and not for the totally independent act of others." *Id.* at 439. Thus, a corporation should not be bound by an obligation it did not incur. Second, the rule promotes free alienability of corporate assets. *Polius v. Clark Equip. Co.,* 802 F.2d 75, 78 (3d Cir.1986). In a market economy, free alienability of economic assets encourages their productive use.

### Exceptions to the General Rule

 There are, however, four well-recognized exceptions to the general rule. Liability may be imposed on a purchasing corporation (1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is a "mere continuation" of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations. *Leannais,* 565 F.2d at 439 (discussing Wisconsin law).[2] Exceptions (1) and (4) are not relevant to the present case.

Instead, plaintiff relies primarily on the mere continuation exception and, to a lesser degree, the de facto consolidation/merger exception. The mere continuation exception applies "if the succession is just one of form so that the new corporation 'is in reality, however, it may be in law, a mere continuation of the old corporation.'" *IGL—Wisconsin Awning, Tent & Trailer Co. v. Greater Milwaukee Air & Water Show, Inc.,* 185 Wis.2d 864, 869, 520 N.W.2d 279 (Ct.App. 1994) (citing 15 William Meade Fletcher, et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 7329 (1990)). "'This exception encompasses the situation where one corporation sells its assets to another with the same people owning both corporations.'" *G.P. Publications, Inc. v. Quebecor Printing—St. Paul, Inc.,* 125 N.C.App. 424, 481 S.E.2d 674, 679 (1997) (quoting *Ninth Ave. Remedial Group v. Allis–Chalmers Corp.,* 195 B.R. 716, 724 (N.D.Ind.1996)).

 The mere continuation exception requires a common identity of directors, officers, and stockholders, and the existence of only one corporation at the completion of the transfer. *Travis v. Harris Corp.,* 565 F.2d 443, 446 (7th Cir.1977). The "key element", though, is the "common identity of the officers, directors and stock holders in the selling and purchasing corporations." *Fish v. Amsted Ind., Inc.,* 126 Wis.2d 293, 301–02, 376 N.W.2d 820. The test is "not whether the business operation continues, but ... whether there is a continuation of the corporate entity." *Travis,* 565 F.2d at 446 (quoting *National Dairy Prods. Corp v. Borden Co.,* 363 F.Supp. 978 (E.D.Wis.1973)).

Some courts have considered other factors relevant to the issue of mere continuation. In *Wine Imports of Am., Ltd. v. Gerolmo's Liquors, Ltd.,* 563 F.Supp. 163, 166 (E.D.Wis. 1983), the court looked for the presence of

---

**2.** See *North Shore Gas Co. v. Salomon, Inc.,* 152 F.3d 642, ——–——, No. 97-2485, slip op. at 14–29 (7th Cir. Aug. 5, 1998), for a recent discussion of the exceptions to the general rule under federal common law.

"formal [or] informal ties." And in *G.P. Publications*, 481 S.E.2d at 682, the court asked whether the consideration for the asset sale was adequate and whether the transaction in question was a good faith purchase for value. Generally, however, as stated above, the "key element ... is a common identity of the officers, directors and stockholders in the selling and purchasing corporations." Phillip I. Blumberg, *The Continuity of The Enterprise Doctrine: Corporate Successorship in United States Law*, 10 Fla. J. Int'l L. 365, 370 n. 18 (1996).

■ Plaintiff also suggests that the sale of Lockwood's assets to Agromac comes within the de facto/merger exception. This exception applies when there exists (1) continuity of business operations; (2) continuity of ownership; (3) cessation of the seller's operation after the sale; and (4) assumption by the purchaser of the seller's obligations to the extent necessary to keep the business going. *Parson v. Roper Whitney, Inc.*, 586 F.Supp. 1447, 1449 (W.D.Wis.1984). Under Wisconsin law another consideration "in determining whether a merger or *de facto* merger has occurred is that the transfer of ownership was for stock in the successor corporation rather than cash." *Fish*, 126 Wis.2d at 301–02, 376 N.W.2d 820. A de facto merger occurs when the successor corporation absorbs the predecessor without the formalities of a merger. *Arnold Graphics Indus. v. Independent Agent Ctr. Inc.*, 775 F.2d 38, 42 (2d Cir.1985).[3]

■ These exceptions prevent a corporation from escaping its liabilities merely by changing hats. Fletcher, *supra*; *Armour–Dial, Inc. v. Alkar Eng'g Corp.*, 469 F.Supp. 1198, 1201 (E.D.Wis.1979). Corporations should not evade obligations incurred by manipulating the technicalities of a transaction. *Allied Corp. v. ACME Solvents Reclaiming, Inc.*, 812 F.Supp. 124, 129 (N.D.Ill.1993). Courts will give close scrutiny to "corporate realities, not mechanical application of a multi-factor test." *North Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, at ——, No. 97–2485, slip op. at 22 (7th Cir. Aug. 5, 1998). If the transaction is not an arm's-length affair,

courts may impose successor liability, not only to protect innocent victims, but also because the policies underlying the general rule no longer apply. Absolving corporate responsibility for the acts of others and allowing easy transferability of corporate assets do not apply to an asset sale which is not a bona fide transaction between separate parties.

Continuity of ownership is the common thread in both exceptions claimed by the plaintiff. Courts will not generally find a case within either the mere continuation or de facto merger exceptions unless there is continuity of ownership between the selling and purchasing corporation. Continuity of ownership strongly suggests the absence of a bona fide transaction. In the present case, plaintiff cannot show continuity of ownership between Lockwood and Agromac. Prior to the asset sale, neither Agromac nor its principals, Wood and Schon, owned any Lockwood stock. Plaintiff, however, contends that successor liability should be imposed notwithstanding the absence of this element, citing several cases imposing successor liability without continuity of ownership, and arguing that the facts of this case warrant the imposition of liability on Agromac.

Plaintiff's situation reflects the tension at the heart of the debate about successor liability. On the one hand, it is thought unwise to impose such liability on one who did not create it. This is so both because it would be unfair and because it would discourage the transfer of assets due to the risk of incurring known and unknown liabilities. On the other hand, no successor liability means that innocent third parties, like Gallenberg, will sometimes be harmed and left without a remedy for their injuries. "[T]he basic issue in every successorship case is how to strike a balance between on the one hand preventing wrongdoers from escaping liability and on the other hand facilitating the transfer of corporate assets to their most valuable uses." *Equal Employment Opportunity Commission v. Vucitech*, 842 F.2d 936, 945 (7th Cir.1988).

---

**3.** The mere continuation and de facto merger exceptions "tend to overlap" and "no criteria can be identified that distinguish them in any useful manner." *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 275 (D.C.N.J.1994) (quoting *Lumbard v. Maglia*, 621 F.Supp. 1529, 1535 (D.C.N.Y.1985)).

### Expanded or Additional Exceptions

In some areas of the law courts have expanded on or created additional exceptions to the general rules on successor liability. For example, in the area of product liability, courts have developed the "product line doctrine" to address the problem of people injured by defective products manufactured by a predecessor corporation. Blumberg, *supra*, at 373. Under this doctrine successor liability will be imposed for injuries caused by defective products manufactured by a predecessor if the successor continues to manufacture the product. Courts have also developed the "continuity of the enterprise" doctrine (also known as the "substantial continuity" doctrine) in the same context. Under this doctrine, successor liability may be found if there is continuity of the business even if not of the owners. Courts look at the totality of the circumstances and focus on elements such as the use of the same employees, facilities, location, products and trade name, as well as the successor holding itself out as the continuation of the previous enterprise. *Id.* at 377 n. 47.[4]

Gallenberg relies on several commercial law cases where courts have imposed successor liability without requiring continuity of corporate ownership. The leading case of this type is *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265 (D.N.J.1994). In *Glynwed* the plaintiff contended that the defendant corporation was liable under a long term lease executed by its predecessor. As in the present case, the successor had purchased the assets of the predecessor at a secured party sale pursuant to section 9–504 of the Uniform Commercial Code. *Id.* at 268. In determining whether there was successor liability the court looked at four factors: (1) continuity of management, personnel, physical location, assets and general business operations; (2) immediate cessation of business and dissolution by the predecessor; (3) assumption of liabilities necessary for uninterrupted continuation of the business of the

predecessor; and (4) continuation of ownership/shareholders. *Id.* at 275–76. The court held, however, that not all four factors needed to be present. Instead, the court said that the critical factor was that the parties intended to merge rather than merely transfer assets, and relied heavily on a memorandum executed by the purchaser clearly manifesting the parties' intention to merge.

*Glynwed,* though, has been criticized for unjustifiably relaxing the traditional test of successor liability. *G.P. Publications,* 481 S.E.2d at 680–82. The *G.P. Publications* court suggested that without acknowledging it, *Glynwed* imported the continuity of enterprise doctrine from the product liability context into commercial law:

> "In the context of a commercially reasonable sale under U.C.C. § 9–504, allowing successor liability based on factors other than inadequate consideration and identity of ownership might have a chilling effect on potential purchasers who would have to be concerned that by acquiring a foreclosed business, they would also acquire liabilities they never intended to assume.... [W]e believe that no public policy is served by applying the 'substantial continuity' test in a situation like the instant case ..."

*Id.* 481 S.E.2d at 682.

Another case in which successor liability was imposed without continuity of ownership is *Fiber–Lite Corp. v. Molded Acoustical Prod. of Easton, Inc.*, 186 B.R. 603 (E.D.Pa. 1994). In *Fiber–Lite* a predecessor corporation entered into a post-bankruptcy lending agreement with its secured lender. The predecessor defaulted and the lender foreclosed on its assets and both engineered and financed an asset purchase by a successor corporation whose only shareholders were the children of the sole shareholder of the predecessor corporation. The court imposed liability on the successor and stated that one could easily conclude that the transaction was entered into fraudulently and orchestrat-

---

4. Courts have also relaxed successor liability requirements to vindicate policies embodied in federal statutes in such areas as environmental law, *see* William B. Johnson, Annotation, *Liability of Parent or Successor Corporation, or Corporate Shareholders, in Action Pursuant to Comprehensive Environmental Response, Compensation and* *Liability Act,* 121 A.L.R. Fed. 173 (1994), labor law, *see Golden State Bottling Co. v. N.L.R.B.,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), and employment discrimination law, *see Musikiwamba v. ESSI, Inc.,* 760 F.2d 740 (7th Cir.1985).

ed by the secured lender to allow its debtor—the predecessor corporation—to escape liability from unsecured debt. *Id.* at 609.

*Glynwed* and *Fiber–Lite* show that in a commercial law context courts may occasionally find the presence of the mere continuation or de facto merger exceptions without continuity of ownership. However, courts have been reluctant to expand the exceptions to the general rule because of concern about undermining the policies behind the general rule. The element of continuity of ownership suggests the lack of a wholly bona fide transaction. As I read the cases, courts will impose successor liability without continuity of ownership only if there is. evidence that the transaction was more than a mere asset sale, *see, e.g., Glynwed,* or if there is evidence of the absence of an arm's-length transaction, *see, e.g., Fiber–Lite.*

And other courts, notably those of Wisconsin, have not relaxed the traditional test for establishing successor liability. In *Fish* the Wisconsin Supreme Court declined to adopt the "product line doctrine" and reaffirmed its adherence to the common law rule even in the product liability context. *Fish,* 126 Wis.2d at 295, 376 N.W.2d 820. The Court further rejected any expansion of the mere continuation exception. *Id.* at 312, 376 N.W.2d 820. While the Wisconsin Supreme Court has not recently decided a successor liability case in the commercial context,. I think it unlikely that the Court would expand the exceptions to the common law rule.

### Application of the Law to the Facts of This Case

■ Plaintiff compares the present case to *Glynwed* because for several years prior to the asset sale Agromac manifested an intent to effectuate a controlling interest in Lockwood. The facts of the present case are not comparable to those of *Glynwed.* In *Glynwed* the court found that there was a clear intent by the contracting parties to effectuate a merger or consolidation rather than a mere asset sale. Even assuming Wood and Schon wanted tó own Lockwood, the asset sale here had none of the indicia of a merger. It may well be that, from the beginning of their involvement with Lockwood or soon after, Wood and Schon hoped to become its owners. Such intent, however, is not reprehensible or a reason to impose successor liability. In the absence of evidence that the asset sale was intended as a merger or consolidation, Wood's and Schon's wish to own Lockwood is not a basis for an adverse inference. Wood and Schon spent several years attempting to reorganize and revive Lockwood. There is no evidence that they acted in bad faith. Had they succeeded, Lockwood would have remained bound by its agreement with Gallenberg. Unfortunately, their effort failed. Thus, even if Wisconsin recognized the *Glynwed* type of exception, it would not apply here.

Plaintiff also argues that there were close formal and informal ties between Agromac, Wood, Schon and Lockwood. Such ties were one of the factors that the court in *Wine Owners* suggested was relevant to the successor liability inquiry. Close ties clearly existed between Agromac and Lockwood. Wood and Schon ran Lockwood for approximately three years prior to the asset sale. I find, however, that close ties, without more, do not give rise to an inference of an intention to merge corporations or of the absence of an arm's-length transaction.

Plaintiff stresses that the requirement of continuity of stock ownership is less significant in this case because, for at least several years before the asset sale, shares of Lockwood stock had no value. Plaintiff compares the case to *IGL,* where the court found that the relationship between predecessor and successor corporations was sufficient to warrant the imposition of successor liability. *IGL,* though, does not apply here because both the predecessor and successor corporations were non-profit corporations that issued no stock. The policies underlying the no successor liability principle are geared toward encouraging economic actors to function effectively in a market economy and have no application in the context of non-profit and non-stock organizations.

Gallenberg makes the related argument that the continuity of ownership requirement is satisfied in this case because Wood and Schon were de facto shareholders. This argument equates control with ownership. They are not the same, however, and unless there is evidence that the control was used in an inappropriate manner or towards an inap-

propriate end, it is not a basis for successor liability. If, for example, plaintiff could show that Agromac's control was used to effectuate a transaction involving inadequate consideration or the rejection of a superior offer or the evasion of the claims of creditors, successor liability might well attach. The evidence does not show that Agromac's control was used for such purposes. Moreover, Wood's and Schon's control over Lockwood was not unlimited. Many of their important decisions had to be ratified by shareholders, the bankruptcy court, unsecured creditors, or Norwest. Wood's and Schon's decision-making authority took place within a fairly well-defined set of boundaries.

Finally, Gallenberg compares this case to *Fiber–Lite*. The facts of *Fiber–Lite*, however, were substantially different. There, the secured creditor orchestrated a transaction to evade the claims of unsecured creditors, and for less than reasonable consideration. The evidence here does not show that the asset sale was a device to evade creditors, or that the purchase price was commercially unreasonable. I am not unduly troubled by the bankruptcy court's refusal to approve the section 363 sale, by the short notice period preceding the sale, or by the fact that the sale took place during the holiday season. Agromac wanted to purchase Lockwood's assets, and after managing Lockwood for three years, had the inside track over other prospective purchasers; in addition, Agromac may have benefitted from its longstanding relationship with Norwest and used its familiarity with the situation to its own advantage. Nevertheless, there is no evidence that, in carrying out the asset sale, either Agromac or Norwest violated any rules. It is not against the law to be aggressive or opportunistic in business, and it is not a basis for imposing successor liability. Thus again, even presuming Wisconsin followed *Fiber–Lite*, the present case is distinguishable.

In sum, I am unable to find in the facts of this case a compelling reason for departing from the general rule of no successor liability. In the absence of continuity of ownership between Lockwood and Agromac, Agromac is not a mere continuation of Lockwood. Nor was the asset sale a merger in disguise. The asset sale in this case came about only after Agromac's efforts to revive the Lock-

wood business failed. The sale created an obligation on the part of Agromac to pay over $5 million. There is no evidence that the transaction was not an arm's-length deal. Thus, Agromac cannot be held to Lockwood's dealership arrangement with Gallenberg, Gallenberg's summary judgment motion must be denied in regard to the successor liability issue, and summary judgment instead will be granted in favor of Agromac on this matter.

Gallenberg's WFDL claim against Agromac obviously depends on the existence of a dealership agreement between it and Agromac. Because no such agreement exists, summary judgment must be granted in favor of Agromac on this issue as well. Gallenberg's motion regarding this claim, of course, will be denied.

## IV. CONCLUSION

The case reflects the irreconcilable interests and the competing policies which make successor liability cases difficult. Agromac should not be bound by obligations that it had no part in creating. Also, it is possible that neither Agromac nor any other company would have purchased Lockwood's assets if all the Lockwood liabilities went with it. Yet Gallenberg, which did nothing wrong, finds its dealership terminated. Gallenberg has argued that the facts of the case warrant departure from the general rule of no successor liability. For the reasons stated, however, the law does not support Gallenberg's contentions.

**THEREFORE, IT IS ORDERED** that Gallenberg's motion for partial summary judgment is **DENIED**, Agromac's motion for summary judgment is **GRANTED**, and this case is **DISMISSED**.