PER CURIAM.
¶ 1 Lunda Construction Company appeals the circuit court's dismissal, on summary judgment, of two sets of claims made by Lunda: a successor liability claim against Veritas Steel, LLC, and fraudulent transfer claims against Veritas, Atlas Holdings, LLC, Bridge Resources, LLC, Alan Sobel, and Matthew Cahill. Both sets of claims are based on Lunda's allegation that Veritas and related entities structured a purchase of all of the assets of PDM Bridge, LLC, in exchange for inadequate consideration, and that this prevented Lunda from satisfying a judgment that Lunda had secured against PDM.
¶ 2 Applying controlling precedent of our supreme court, we affirm the court's summary judgment dismissing the successor liability claim. See Fish v. Amsted Indus. Inc. , 126 Wis. 2d 293, 376 N.W.2d 820 (1985). Under this precedent, both the "de facto merger" and "mere continuation" exceptions to the general rule against successor liability require concrete evidence showing an "identity of ownership" common to seller and buyer, and there is no such evidence here. Lunda asks us to broaden these exceptions, effectively creating a new exception to the rule against successor liability. This would be a new direction for our supreme court alone to chart.
¶ 3 We also affirm the court's summary judgment dismissing the fraudulent transfer claims against the Veritas entities on the ground that Lunda implicitly concedes that the asset transfer that it challenges cannot be "voidable" under pertinent statutes because the transfer resulted from the enforcement of security interests. We affirm dismissal of the claims against Sobel and Cahill because Lunda provides no evidence creating a genuine issue of material fact that PDM failed to receive value for the bonuses they received.
BACKGROUND
¶ 4 Before summarizing details, we provide a brief overview. Lunda obtained a $16 million judgment against PDM. At the same time, PDM separately owed approximately $76 million to lenders in loans that were secured by PDM's assets, on which PDM began to default. While the Lunda judgment was still unsatisfied and PDM was in default on the $76 million in loans, the lenders executed a complex series of transactions, including a "strict foreclosure agreement," through which Veritas acquired PDM's assets in exchange for PDM getting out from under its outstanding debts to the lenders.
¶ 5 Stated broadly, Lunda alleges that the Veritas entities used these complex transactions to take advantage of PDM's defaults on the lenders' loans, by exchanging inadequate consideration for ownership of PDM's lucrative steel fabrication business, with the intention of leaving PDM unable to satisfy Lunda's $16 million judgment. Stated as legal claims, Lunda alleges that (1) Veritas is liable to Lunda for the judgment as a successor to PDM, and (2) Veritas and others were the recipients of transfers that were fraudulent as to Lunda as a creditor within the meaning of the Wisconsin Uniform Fraudulent Transfer Act because PDM did not receive "a reasonably equivalent value in exchange for the transfer," see WIS. STAT. §§ 242.04(1)(b) and 242.05(1) ).[1]
¶ 6 We now provide a more detailed factual summary, based on undisputed facts. During pertinent periods PDM fabricated steel.[2] In December 2006, PDM entered into a credit agreement with multiple lenders. The lenders agreed to provide PDM with substantial loans. As security for repayment, the lenders obtained a first priority lien on PDM's assets. In sum, the lenders provided PDM with a credit facility under which PDM's obligations to the lenders were secured by first priority liens on PDM's assets.
¶ 7 Lunda is a construction contractor. Lunda and PDM entered into a contract obligating PDM to provide steel for a bridge construction project. Lunda sued PDM for breach of contract in 2012 and, in June 2014, obtained a $16 million judgment against PDM.
¶ 8 No later than 2011, PDM defaulted on obligations to the lenders under the credit agreement. By 2013, PDM was indebted to the lenders on secured debt with a face value of approximately $76 million. In June 2013, the lenders and PDM executed a forbearance agreement, in which PDM agreed to either sell itself to an interested acquirer or restructure, in either case with help from an investment bank. Toward this end, PDM was to attempt to "execute a binding purchase agreement with one or more" interested parties and to consummate a sale acceptable to the lenders by September 30, 2013.
¶ 9 PDM retained an investment banker to market a sale of PDM for the highest price available. Of 136 potential buyers contacted by the investment banker, only six submitted indications of interest, and none offered a price high enough to pay off PDM's outstanding secured debt. In other words, no bid was high enough to have resulted in residual funds to pay unsecured creditors such as Lunda. The highest bid for PDM came from Atlas Holdings, LLC, at $33 million. Atlas was a common parent company of the lenders.
¶ 10 The lenders decided to use a series of transactions to acquire PDM's assets, which we now summarize. The lenders created a new entity, Bridge Resources, LLC, to aid in the acquisition of PDM's assets.[3] Through these transactions, affiliates of Atlas and a co-investor purchased all of PDM's outstanding debt directly from the lenders, for approximately $22 million, a price that was heavily discounted from the total face value of the debt.
¶ 11 Pertinent transactions included the following. In September 2013, under the credit agreement, Bridge Resources caused to be filed several amended UCC financing statements reflecting that it had replaced another entity in the role of the administrative agent holding the security interest in PDM's assets. In October 2013, PDM entered into a "transaction support agreement" with the lenders, including Bridge Resources. In the transaction support agreement, the parties expressed a mutual desire to "transition[ ]" "all or a substantial portion of the business of" PDM and its subsidiaries to the lenders or to designees. The transaction support agreement effectively called for a "strict foreclosure" on the collateral securing PDM's loans in exchange for partial satisfaction-approximately $71 million of the outstanding $76 million in secured debt-of PDM's obligations under the December 2006 credit agreement between PDM and the lenders.[4]
¶ 12 To carry out the strict foreclosure, Atlas caused the creation of a subsidiary called Veritas Steel, LLC, which was assigned a first priority lien on PDM's assets, with Bridge Resources and other lender affiliates becoming subsidiary lien holders. In November 2013, using a strict foreclosure agreement, PDM conveyed to Veritas the collateral securing its loan, in exchange for discharge of approximately $71 million of the approximately $76 million face value of unpaid, secured debt that PDM owed under its credit agreement with the lenders. Thus, through the strict foreclosure agreement, PDM conveyed its assets to Veritas, the entity designated by the lenders, in exchange for the discharge of approximately $71 million of secured debt, with $5 million in debt remaining in PDM's credit facility.
¶ 13 Under Veritas' ownership, PDM's former business operated as it had before, employing the same work force and pursuing many of the same projects. PDM's officers, Alan Sobel and Matthew Cahill, assumed the same positions with Veritas as they had at PDM, and the two men received bonuses of $84,000 and $140,000, respectively.
¶ 14 PDM was not able to satisfy Lunda's $16 million judgment. In July 2014, Lunda took steps to assert a lien on funds owed to Veritas by the Wisconsin Department of Transportation for projects on which PDM had worked.
¶ 15 In February 2015, Veritas commenced this action against Lunda, seeking a declaration that Lunda has no claim to payments by the department for the transportation projects at issue. Lunda asserted counterclaims and commenced a third-party action against Bridge Resources, Atlas, Sobel, and Cahill. Lunda alleged that the defendants had taken unfair advantage of PDM's loan defaults, "with the intent to gain ownership of PDM's lucrative steel fabrication business for grossly inadequate consideration through a secretive, unlawful and fraudulent process designed to render PDM an empty shell with no assets remaining to satisfy PDM's eight-figure liability to Lunda." The alleged scheme involved "totally control[ing] PDM before, during and after the transition of PDM's business to the Defendants, which business Defendants are continuing to operate, albeit under a different name," to "maximize their own economic interests at the expense of Lunda[,] whose more than $16 million judgment against PDM remains unsatisfied."
¶ 16 Lunda appeals dismissal of only two sets of its various claims: a successor liability claim against Veritas and fraudulent transfer claims against Veritas as well as third-party defendants Atlas, Bridge Resources, Sobel, and Cahill. For ease of reference, we follow Lunda in referring to these parties as the Veritas entities.
¶ 17 Lunda appeals the circuit court's dismissal of the successor liability claim. The court's primary analysis was the following:
[T]he longstanding law in Wisconsin is, like it or not from the perspective of unsecured creditors, the corporation that acquires the assets of another corporation does not acquire the target corporate liability.... [T]he majority holding [in Fish v. Amsted Indus. Inc. , 126 Wis. 2d 293, 376 N.W.2d 820 (1985),] is good law and is directly analogous to and applicable to this situation, and the absence of a stock transfer and the continuation of ownership then deprives Lunda ... the ability to prevail on its [successor liability] claim[ ].
¶ 18 Lunda also appeals the court's dismissal of the fraudulent transfer claims. The court pointed out that it is not disputed that the value of PDM at the time of the asset transfer was less than the total face value of the secured debt ($71 million). The court expressed the view that, although Veritas purchased the debt for far less, the actual value of the secured debt "in a commercially viable world" was $71 million. As to Sobel and Cahill in particular, the court determined that "the undisputed facts show that PDM did receive value from" pertinent work performed by Sobel and Cahill, and that "there's no evidence to indicate that" payments were made to Sobel or Cahill with intent "to defraud Lunda."
DISCUSSION
¶ 19 We first address successor liability issues, then fraudulent transfer issues.[5] On all issues, we review de novo the circuit court's rulings on motions for summary judgment, applying the same methodology that circuit courts apply. See Green Spring Farms v. Kersten , 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987) ; WIS. STAT. § 802.08(2) (summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").
I. SUCCESSOR LIABILITY
¶ 20 "As a general rule, 'a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation.' " Fish , 126 Wis. 2d at 298 (quoting Leannais v. Cincinnati, Inc. , 565 F.2d 437, 439 (7th Cir. 1977) ); see also Wright v. Milwaukee & St. Paul Ry. Co. , 25 Wis. 46, 52 (1869) (a corporation does not, "by selling a portion of its property, or even the whole of it, impose upon the purchaser any liability for its general debts").[6] Fish explains that there are "four well recognized exceptions to this general rule," two of which are pertinent to this appeal: the de facto merger exception, which applies " 'when the transaction amounts to a consolidation or merger of the purchaser and seller corporations' "; and the mere continuation exception, which applies " 'when the purchaser corporation is merely a continuation of the seller corporation.' " See Fish , 126 Wis. 2d at 298 (quoting Leannais , 565 F.2d at 439 ).
¶ 21 Lunda argues that the Veritas entities are not entitled to summary judgment on its successor liability claim because there are genuine issues of material fact regarding both the de facto merger and mere continuation exceptions. We resolve this issue based on our interpretations of Fish . Lunda does not dispute that we must affirm if we reject its interpretations of Fish , putting aside public policy arguments Lunda makes that we are without authority to address. We now discuss pertinent aspects of Fish , and then explain why we construe Fish to stand for the proposition that neither the de facto merger nor the mere continuation exceptions can apply on the undisputed facts here.
¶ 22 Fish is a products liability case that addresses successor liability.[7] The lead plaintiff was injured while operating a press. Fish , 126 Wis. 2d at 295-96. The press had been manufactured 22 years earlier by Bontrager. Id. at 296. In the meantime, Amsted had acquired Bontrager's assets in a cash sale, with Bontrager agreeing to use "best efforts" to make Bontrager employees "available to Amstead." Id. Amsted declined to assume Bontrager's tort liabilities arising out of defects in products manufactured by Bontrager. Id. No Amsted officer or director had been an officer of director of Bontrager, with one exception that lasted four years. Id. After acquiring Bontrager, Amsted continued, for a time, to manufacture the type of press at issue through a wholly owned subsidiary, using the same manufacturing facilities and equipment used by Bontrager, although the subsidiary implemented its own policies and procedures for doing so. Id. at 296-97.
¶ 23 The plaintiffs in Fish alleged that, as successor corporations, Amsted and a subsidiary were liable to the plaintiffs for the acts of Bontrager in manufacturing the allegedly defective press. Id. at 297. Our supreme court affirmed the circuit court's grant of summary judgment to Amsted and the subsidiary, dismissing the plaintiffs' claim of successor liability. Id. at 295, 312. The court concluded that "there is not sufficient identity between Bontrager and either Amsted or [the subsidiary] to justify holding them liable for the acts of their predecessor." Id. at 295.
¶ 24 Significantly, given the arguments that Lunda now makes, the court in Fish rejected the plaintiffs' argument that a prior products liability opinion, Tift v. Forage King Industries, Inc. , 108 Wis. 2d 72, 322 N.W.2d 14 (1982), had expanded the de facto merger and mere continuation exceptions beyond the Wisconsin rules as they had been interpreted by the federal appellate court in Leannais .[8] In Tift , our supreme court had ruled, in favor of the plaintiffs, that there was "clear" "identity" between the sole proprietorship that manufactured the machine in question and a successor corporation to the sole proprietorship. Id. at 80. The court in Tift stated that it was applying "existing corporate law" to hold that, because "[e]ssentially the same manufacturing operation and the manufacture of the same product ... was continued through all these organizational transformations," there was an "identity" between seller and acquirer sufficient to render the acquirer "answerable to an injured plaintiff by the same reasoning that the original manufacturer would be." Id. at 79-82. The court in Tift also stated that the de facto merger and mere continuation exceptions are to be applied in a way that "encourage[s] 'piercing the corporate veil' " and are meant to "look to the substance and effect of business transformations or reorganizations to determine whether the original organization continues to have life or identity in a subsequent and existing business organization." Id. at 78-79. This language in Tift appeared to expand the exceptions to the general rule against successor liability.[9]
¶ 25 However, the court in Fish rejected the plaintiffs' argument that the court in Tift established a rule of liability for successor entities when there is a shared "identity" between the seller and the buyer on a topic other than a shared identity of ownership . See Fish , 126 Wis. 2d at 300-01 ("Plaintiffs are in error in alleging that the Tift decision has expanded the exceptions to the rule of nonliability."). That is, Fish firmly closes the door on an argument that either the de facto merger or mere continuation exceptions could apply when there is no evidence of shared ownership between seller and buyer, because both exceptions are tied to identity of ownership and not to other types of identity between the two entities. Id . at 300-02 (the "key element" of de factor merger exception is "the transfer of ownership" for stock "rather than cash"; the "key element" of mere continuation exception " 'is a common identity of the officers, directors and stockholders in the selling and purchasing corporations' ") (quoting Leannais , 565 F. 2d at 440 ).
¶ 26 These broadly stated holdings in Fish , applying the rules as stated in Leannais , resolve the successor liability issue against Lunda. Lunda does not dispute that there was no stock transfer here and also no ownership continuity between PDM and Veritas. For example, no director or founder of PDM became a director or founder of Veritas.
¶ 27 Lunda attempts to avoid the rules stated in Fish by relying primarily on selected statements in Tift , selected federal court interpretations of Wisconsin law, and precedent from other jurisdictions. However, we have explained how Fish significantly refined the analysis in Tift and, as the later in time opinion, Fish guides us on any point that could be in tension with statements in Tift . See Spacesaver, Corp. v. DOR , 140 Wis. 2d 498, 502-04, 410 N.W.2d 646 (Ct. App. 1987) (when Wisconsin Supreme Court opinions may conflict, the more recent controls). To repeat, Fish rejects this relaxation of the traditional test of successor liability and instead requires attention to concrete evidence of identity of ownership. See Fish , at 300-02.
¶ 28 As one federal district court has noted, "it would appear that the Wisconsin Supreme Court [in Fish ] has effectively determined that, absent a transfer of stock ownership, other merger factors are insufficient to sustain application of the de facto merger exception." Smith v. Meadows Mills, Inc. , 60 F. Supp. 2d 911, 917 (E.D. Wis. 1999).[10] Similarly, the federal court noted, "it appears that the Wisconsin Supreme Court [in Fish ] has made one factor-identity of ownership-a necessary requirement for the mere continuation exception to apply." Meadow Mills , 60 F. Supp. 2d at 918. In a similar vein, the Court of Appeals for the Seventh Circuit has noted that, even where the results may be "unsettling" because an asset transfer has occurred under what appear to have been "quite cozy" circumstances, Wisconsin has not "abandoned the identity of ownership requirement in cases involving stock-issuing corporations." Gallenberg Equip., Inc. v. Agromac Int'l, Inc. , No. 98-3288, slip op. at 5 (7th Cir. Aug. 4, 1999).
¶ 29 Lunda effectively asks us to treat the mere continuation exception as a multi-factor test in which the complete absence of a stock transfer evidencing a common identity of ownership can be outweighed by factors such as a continuing identity of control . As noted, however, Fish clearly establishes that the "key element" to applying the mere continuation exception is that there " 'is a common identity of the officers, directors and stockholders in the selling and purchasing corporations.' " See Fish , 126 Wis. 2d at 302 (emphasis added) (quoted source omitted).
¶ 30 Lunda makes an argument based on evidence of pre-acquisition control by the lenders. Lunda argues that, because Atlas bought PDM's debt and "became PDM's lender for the express purpose of controlling the sale and ensuring that PDM's business operations would continue uninterrupted into Veritas in order to preserve PDM's going concern value," "there is evidence of control to effectuate a transaction that was not at arm's length," which could be a substitute for stock-based identity of ownership in establishing successor liability.
¶ 31 Lunda's pre-acquisition control argument may have traction in some jurisdictions. See Gallenberg Equip., Inc. v. Agromac Int'l, Inc. , 10 F. Supp. 2d 1050, 1055-57 (E.D. Wis. 1998) ("[I]n a commercial law context courts may occasionally find the presence of the mere continuation or de facto merger exceptions without continuity of ownership," based on circumstances such as those alleged here, that a secured lender fraudulently orchestrated a sale to allow its debtor to escape liability from an unsecured debt.) (citing a case of this type, Fiber-Lite Corp. v. Molded Acoustical Prod. of Easton, Inc. , 186 B.R. 603 (E.D. Pa. 1994) ). However, Wisconsin is not among those jurisdictions at this time. See Gallenberg Equip. , 10 F. Supp. 2d at 1055.
¶ 32 Lunda points to the fact that the court in Fish twice used the phrase "identity of management and control"-with Lunda emphasizing the word "control"-in referring to the entire period over which transfers of ownership were accomplished in Tift . See Fish , 126 Wis. 2d at 302. This observation does Lunda no good, however, because even if control identity could matter to "mere continuation" analysis under Fish when there is some evidence of common stockholders, here there is no such evidence.[11]
¶ 33 Notably, the court in Fish explicitly and at some length rejected alternative avenues to expand exceptions to the general rule against successor liability, in opposition to dissents by three justices urging more flexible approaches to the exceptions. Id. at 303-22. For all these reasons, it is difficult to discern an intent by the majority in Fish to significantly expand potential liability in the way that Lunda suggests exclusively through these references in Fish .
¶ 34 Lunda also makes public policy arguments that we are without authority to address. We are obligated to follow the law given by our supreme court. See Cook v. Cook , 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) (only our supreme court has power "overrule, modify or withdraw language from a previous supreme court case").
¶ 35 In sum, based on a lack of evidence of identity of ownership of the type required in Fish , we conclude that Lunda has failed to show a genuine dispute of material fact, and therefore Lunda is not entitled to a trial on its successor liability claim.
II. FRAUDULENT TRANSFER
¶ 36 Lunda appeals dismissal of its fraudulent transfer claims against the entities Veritas, Atlas, Bridge Resources, as well as against the individuals Sobel and Cahill. We affirm dismissal of Lunda's fraudulent transfer claims against the entities on a narrow ground based on a concession by Lunda. We affirm dismissal of the fraudulent transfer claims against Sobel and Cahill on the ground that Lunda fails to point to evidence that PDM failed to receive value for the bonuses paid to them.
¶ 37 As we recently had occasion to explain, the Wisconsin Uniform Fraudulent Transfer Act is "a uniform 'creditor-protection statute.' " Beck v. Birdrx, LLC , 2018 WI App 61, ¶ 11, 384 Wis. 2d 207, 918 N.W.2d 96 (quoted source omitted). In general, it "allows a creditor to attack transfers made by a debtor to third parties as fraudulent in certain circumstances." Id. (citing WIS. STAT. §§ 242.04, 242.05 ). A claim under § 242.05(1), such as the one Lunda makes here, "deems certain transactions constructively fraudulent based on the circumstances of the transfer," so that proof of fraudulent intent is not necessary. Beck , 384 Wis. 2d 207, ¶ 12. It "generally attacks certain transfers made without reasonably equivalent value." Id.
¶ 38 With that background, we turn to the claims against the entities here, and a narrow argument by the Veritas entities. The entities argue that the transfer that Lunda challenges cannot be "voidable" under WIS. STAT. §§ 242.04(1)(b) and 242.05(1) because the transfer resulted from enforcement of security interests, and the strict foreclosure here involved the enforcement of security interests. Lunda fails to develop an argument to the contrary and therefore we affirm on that ground.
¶ 39 As the Veritas entities point out, if a transfer challenged as fraudulent under the applicable provisions of the act resulted from "[e]nforcement of a security interest in compliance with ch. 409," which addresses the uniform commercial code-secured transactions, then it "is not voidable." See WIS. STAT. § 242.08(5)(b). The Veritas entities submit that there is no genuine dispute that Lunda challenges the secured transaction that occurred when the Atlas affiliates, PDM, and PDM's owners entered into a strict foreclosure agreement, under which PDM transferred its assets to the newly formed company Veritas, in exchange for discharge of the approximately $71 million of secured debt. This type of transaction appears to comply with WIS. STAT. § 409.620 (entitled in part, "[a]cceptance of collateral in full or partial satisfaction of obligation.").
¶ 40 Lunda provides no counter to this argument, but merely asserts in passing that "the Veritas merger was misnamed a 'strict foreclosure.' " Lunda fails to directly support this misnomer assertion, implicitly conceding the point. See United Coop. v. Frontier FS Coop. , 2007 WI App 197, ¶ 39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession). We cannot tell from its appellate briefing what Lunda means to suggest might be wrong with using the term "strict foreclosure" to describe the transaction at issue here. In any case, whether or not "strict foreclosure" is an apt phrase for the transaction, Lunda fails to provide any argument that it was not "[e]nforcement of a security interest in compliance with ch. 409." See WIS. STAT. § 242.08(5)(b). We note that Lunda uses the unqualified terms "foreclosure process" and "the foreclosure" in referring to the transaction in its own briefing.
¶ 41 Lunda is mistaken if it believes that its overarching argument that all transactions at issue were fraudulent is sufficient to address the specific enforcement-of-security-interest-exception argument based on WIS. STAT. § 242.08(5)(b) that the Veritas entities make. In sum, the Veritas entities make a dispositive argument based on seemingly plain statutory language and the Veritas entities fail to develop a counterargument.
¶ 42 Turning to the claims against Sobel and Cahill, Lunda's argument is brief and conclusory. Lunda claims that PDM failed to receive "reasonably equivalent value in exchange for" the bonuses PDM paid to Sobel and Cahill. See WIS. STAT. §§ 242.04(1)(b), 242.05(1). Lunda's argument is based on the assertion that "the two were acting under Atlas's control and for Atlas's sole benefit." As the sole evidentiary basis for this assertion, Lunda points to evidence that, as Lunda asserts, Cahill and Sobel "follow[ed] Atlas's orders to establish bank accounts for Veritas (ultimately an Atlas-owned entity) in preparation for the Transaction." However, the Veritas entities argue that the only relevant evidence on this point is that the two worked on the strict foreclosure at the direction of PDM's owner, American Securities, and this is not specific evidence upon which a jury could base a finding that PDM received less than $224,000 in value for the bonuses. Lunda concedes the argument by making no reply.
CONCLUSION
¶ 43 For all of these reasons, we affirm summary judgment as to both the successor liability claim and the fraudulent transfer claims.
By the Court .-Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

For ease of reference, we use "PDM" to refer both to the limited liability corporation PDM and its only member.

Bridge Resources LLC, eventually merged into an entity called Bridge Fabrication Holdings LLC, which changed its name to BFH Holdings LLC.

In discussing the strict foreclosure called for in the transaction support agreement, the parties invoked Article 9-620 of the Uniform Commercial Code, under which a debtor turns over to a lender the collateral for a loan in exchange for full or partial satisfaction of a debt.

Lunda seeks to revive a claim for piercing the corporate veil of Veritas to reach Atlas and BFH Holdings LLC, but only if its successor liability claim is revived. Because we affirm dismissal of the successor liability claim we do not address the veil-piercing claim.

The general rule against successor liability and its exceptions applies regardless of the legal form of the businesses involved. See Springer v. Nohl Electric Products Corp. , 2018 WI 48, ¶ 15 n.5, 381 Wis. 2d 438, 912 N.W.2d 1 (citing Tift v. Forage King Indus., Inc. , 108 Wis. 2d 72, 77, 322 N.W.2d 14 (1982) ).

While Fish arose in the products liability context, the court emphasizes that it applies business organization law principles. Fish v. Amsted Indus. Inc. , 126 Wis. 2d 293, 298, 303-04, 376 N.W.2d 820 (1985).

We now summarize Leannais v. Cincinnati, Inc. , 565 F.2d 437 (7th Cir. 1977), because Fish explicitly follows Leannais . The majority in Leannais held that Wisconsin had adopted the general rule of non-liability for corporate asset purchasers, subject to four exceptions including the two that we have summarized. Id. at 439. The majority held that the de facto merger exception "involves the actual absorption of one corporation into another, with the former losing its existence as a separate corporate entity," which had not occurred in Leannais because the consideration given by the purchaser corporation for the assets of the purchased entity did not include shares of the purchaser's own stock. Id. at 439-40. The majority also held that the "key element of a 'continuation' is a common identity of the officers, directors and stockholders in the selling and purchasing corporations," and that in Leannais the management of the acquired entity "was not carried over to" the acquiring entity, "[n]or did any shareholder of either corporation become an owner, director, or officer of the other." Id. at 440.
Further, the majority in Leannais rejected an argument that Wisconsin had adopted or would adopt a "product line" exception to the general rule of non-liability for asset purchasers in the context of products liability cases. Id. at 440-41. The majority disagreed with a dissenting judge, who opined that Wisconsin courts would not limit the exceptions to the four, and would extend "strict liability to successor companies that carry on the product line of their predecessors and that trade on the good name and good will of their predecessors [so as to give] the policy underlying the strict products liability rule ... full effect." See id. at 443 (Fairchild, J., concurring in part, dissenting in part).

We observe for context that some discussion in Tift might best be understood in light of the distinguishable fact that the predecessor form of business entity there was a sole proprietorship, which lacked stock to offer in a stock exchange with the acquiring entity. Cf. IGL-Wis. Awning, Tent and Trailer Co., Inc. v. Greater Milwaukee Air and Water Show, Inc. , 185 Wis. 2d 864, 870, 520 N.W.2d 279 (Ct. App. 1994) (affirming application of successor liability to non-profit corporation succeeding another non-profit, neither of which would have had stock, based on circuit court's fact finding regarding identity of control). See Parson v. Roper Whitney, Inc. , 586 F. Supp. 1447, 1452 (W.D. Wis. 1984) ("The central holding in Tift that defective production by a sole proprietorship can give rise to the subsequent liability of a corporation-is of no significance to the present case involving two corporations.").

Neither side cites the published opinion of this court in Sedbrook v. Zimmerman Design Group, Ltd. , 190 Wis. 2d 14, 526 N.W.2d 758 (Ct. App. 1994) (successor acquisition of predecessor was de facto merger "within the rule of Fish "). However, this opinion does not help Lunda, because in Sedbrook we held that the "key" first step of a four-factor analysis to determine whether a corporate asset purchase may be considered a de facto merger is that "the assets of the seller corporation are acquired with shares of the stock in the buyer corporation, resulting in a continuity of shareholders." See id. at 20-22 (repeating the holding of Fish that "the key element in the analysis is whether the sale was for stock rather than cash"); see also Fish , 126 Wis. 2d at 301. Indeed, in Sedbrook there was a purchase for stock, in lieu of cash, even if the total shares that the acquired entity received "amounted to less than one percent" of the outstanding stock of the successor corporation. See Sedbrook , 190 Wis. 2d at 23-24 & n.3.

Lunda hints at the view that it is impossible to square our reading of Fish with statutory merger requirements under ch. 180, under which one corporation may merge into another by converting its shares not only into "shares," but also "obligations or other securities of the surviving business entity or any other business entity or into cash or other property in whole or part." See Wis. Stat. § 180.1101(2)(c). Along these same lines, the district court in Smith v. Meadows Mills, Inc. , 60 F. Supp. 2d 911, 917 n.3 (E.D. Wis. 1999), found it "troubling" that the predecessor company and the successor company can "achieve[ ] precisely what the de facto merger exception and the statutory transfer of liability were meant to preclude" through transactions that that are "in most ways indistinguishable from a statutory merger under § 180.1101," without the successor assuming liability for obligations of the predecessor. Id. However, we agree with the court in Meadows Mills that, given the language in Fish , this is a tension that only our supreme court or the legislature could resolve.